Arthur Eugene CURTIS, Appellant,

v.

UNITED STATES, Appellee.

No. 9237.

District of Columbia Court of Appeals.

Submitted Sept. 24, 1975.

Decided Dec. 18, 1975.

**470** ▬ ▬▬▬▬▬▬▬▬▬▬

Edward R. Shannon, Washington, D.C., appointed by this court, for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry, Stuart M. Gerson, Daniel A. DeRose and Richard W. Tynes, Jr., Asst. U. S. Attys. were on the brief for appellee.

Before FICKLING and KERN, Associate Judges, and PAIR, Associate Judge, Retired.

FICKLING, Associate Judge:

This is an appeal from appellant's conviction after a jury trial for possession of marijuana in violation of D.C. Code 1973, § 33–402. The sole issue is whether the lower court erred in denying appellant's pretrial motion to suppress the quantity of marijuana, which was discovered as a result of a police stop and frisk. We reverse.

The issue raised by appellant at the suppression hearing was the lawfulness of the police intrusion which resulted in the discovery of the quantity of marijuana. Our decision necessarily rests upon the facts leading up to the confrontation between the police and appellant and what occurred during that encounter.

The facts, as presented by the government[1] at the hearing on the motion to suppress, show that on November 1, 1974, at about 7:20 p. m., while on routine patrol[2] in the 900 block of O Street, N.W., Officers Pope and Thompson observed appellant and a woman walking up an alley. There is no evidence on the record indicating that the woman was being forced to accompany appellant or that she was in any danger whatsoever.[3] Officer Pope did testify that in his five years' experience as a policeman, he had come to know this area as one with "several weapons violations and an unusual amount of homicides." He also stated that the area was known to contain several houses from which narcotics were sold.[4] An unidentified third person standing at the entrance of the alley yelled "police officers" upon seeing the plainclothed officers, and appellant, whose back was towards the officers, made a motion with his hand as if to move his right arm to the left side of his coat. The officer testified, "I couldn't see exactly what he did, but he sort of turned away from us."

Officer Pope testified that when they saw appellant make this gesture:

We immediately went down to the alley to see what he was doing, what he was trying to conceal, if anything, at which time I got out of the car and identified myself as a police officer to him, asked him for some identification, and at the same time I frisked him.

\* \* \* \* \* \*

The purpose of the frisk was to see if he had any weapons, due to the fact that

---

1. Officer Pope was the only witness to testify at the hearing.

2. It does not appear from the record that the officers had reports of, or were investigating, any criminal acts.

3. In her uncontradicted testimony at trial, the woman indicated that she had asked appellant, a friend of hers, to accompany her to her car which was parked in the alley. She testified that she and appellant were conversing as they walked up the alley.

4. When cross-examined at the hearing, the officer stated that appellant had not been seen coming from one of these houses.

the alley was very dark, and this area is notorious for several assaults.

Appellant resisted the frisk and "asked what was this for." After Officer Pope attempted to explain his actions, appellant continued to resist and, in the ensuing struggle, a brown package fell from appellant's coat pocket to the ground. After a field test, the officers determined that the green weed substance inside the package was marijuana.

From these facts the question emerges whether the initial stop of appellant was lawful. Resolution of the reasonableness of the police intrusion in this case requires an examination of the general principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry*, the Court held that the "inestimable right of personal security" guaranteed by the Fourth Amendment belongs as much to a citizen on the street as to a person within the privacy of his home. *Id.* at 8–9, 88 S.Ct. 1868. Moreover, the Court noted that the Fourth Amendment governs the seizure of a person even though the police intrusion falls short of a traditional arrest, so that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment. *Id.* at 16, 88 S.Ct. at 1877. In the case at bar, there can be no question but that Officer Pope seized appellant when he physically took hold of him in order to conduct a frisk. At this point appellant's liberty was restrained and he was not free to walk away.

Having decided that appellant was "seized" when the officer physically stopped him in order to conduct a frisk, we must now determine whether this initial police intrusion was reasonable under the facts of this case. In order to justify a particular seizure, *Terry* requires that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant" the intrusion. *Id.* at 21, 88 S.Ct. at 1880. These specific and articulable facts must be sufficient to allow the police officer to reasonably conclude in light of his experience "that criminal activity may be afoot." *Id.* at 30, 88 S.Ct. at 1884. Moreover, in assessing the reasonableness of a seizure, the police intrusion must be judged against an "objective standard," that is, whether the facts available to the police officer at the moment of the seizure warrant a man of reasonable caution in the belief that the seizure was reasonable. *Id.* at 21–22, 88 S.Ct. 1868. The Court in *Terry* went on to observe:

> And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. [*Id.* at 27, 88 S.Ct. at 1883.]

Turning to the facts of this case, the articulable "facts" which the government points to in support of its claim that the initial seizure was reasonable are that (1) appellant was accompanied by a woman (2) when he walked up an alley at night in a high crime area of the city, and (3) appellant moved his right arm to the left side of his coat upon hearing an unidentified person yell "police officers." Tested objectively as *Terry* requires, we are of the opinion that these limited facts, "taken together with rational inferences," did not constitute reasonable grounds supporting a conclusion that some particular criminal activity was afoot. Rather, we hold that in making the initial seizure of appellant, the officers were acting merely on a suspicion or hunch and, accordingly, the intrusion was unreasonable at its inception.

The incident in question occurred at 7:20 p.m. and, although it was dark, that certainly is not an unusual hour for

citizens of this city to be walking in the streets. Neither is it unusual to observe a man accompanied by a woman at this time of the evening. It is significant that the officers observed nothing to indicate that the woman was being forced to accompany appellant or had any reason to fear for her safety.[5] Moreover, we eschew the notion that the above facts assume added significance because they happen to have occurred in a high crime area. This familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct. *See Kenion v. United States,* D.C.App., 302 A.2d 723 (1973); *Gray v. United States,* D.C.App., 292 A.2d 153 (1972).

All that remains, therefore, to justify the police intrusion is the appellant's hand movement upon hearing the words "police officers." It is important to note that the officers could not see what appellant was doing with his hand since his back was towards them. Under the circumstances of this case, such a "furtive gesture" was clearly insufficient to lead the officers to reasonably conclude that criminal activity was afoot. *See Tyler v. United States,* D.C.App., 302 A.2d 748 (1973).

The result reached in the instant case is consistent with our decision in *Tyler.* There, a police officer, while cruising an alley at 3:30 a. m. in a high crime area, came upon a man sitting on the passenger side of an automobile parked with its engine and lights off. Upon approaching the man, the officer noted that the man began to get nervous and "appeared to be attempting to conceal, or was fumbling with something . . . in the area of his seat." Utilizing a *Terry* analysis, Associate Judge Yeagley held that this scenario did not present sufficient articulable facts to indicate "that criminal activity may be afoot." *Tyler, supra* at 749.

Since we hold that the initial seizure of appellant's person was unreasona-

ble under the circumstances, any subsequent search of the appellant flowing from the unreasonable seizure cannot be sustained. Although *Terry v. Ohio, supra* 392 U.S. at 27, 88 S.Ct. 1868, held that a police officer, under appropriate circumstances, may make a reasonable, limited search for weapons in the interest of his own protection, this rule cannot be invoked unless the preceding seizure was reasonable. Consequently, the evidence which was discovered as a direct result of the violation of appellant's Fourth Amendment rights cannot be used against him in view of the exclusionary rule. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

Accordingly, the quantity of marijuana discovered as a result of the illegal seizure should have been suppressed.

*Reversed.*

---

5. It is interesting to note that, at trial there was uncontradicted testimony by the woman that she was frisked along with appellant.