Patrick L. JAMES, Appellant

v.

UNITED STATES, Appellee.

No. 96–CF–1359.

District of Columbia Court of Appeals.

Argued Nov. 20, 2002.

Decided Aug. 14, 2003.

Larry B. Blackwood, appointed by the court, for appellant. Rufus H. Williams, also appointed by the court, was on the brief for appellant.

Jonathan W. Haray, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

Appellant was charged with carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition. He filed a motion to suppress evidence, but it was denied after a hearing. Appellant then entered a plea of guilty, but reserved his right to challenge on appeal the denial of his motion to suppress. *See* Super. Ct.Crim. R. 11(a)(2). He now argues that the police did not have specific and articulable facts which would allow them to conduct a protective search of his car. We affirm.

I

At about 9:00 p.m. on September 15, 1995, Officer Darrell Green was driving southbound on Georgia Avenue with his partner, headed toward Howard University Hospital. As he was proceeding in the right lane, a blue Ford Tempo which was slightly ahead of him in the left lane suddenly began to veer into his lane. Officer Green honked the horn, but the other car continued into his lane. Officer Green then slammed on the brakes, "hit the air horn and ... turned on [his] emergency lights to conduct a traffic stop."

The blue Tempo slowed down, but did not stop. Officer Green said that there were several places to stop, and that every time the car passed one, he would hit the siren again. The officer, however, did not believe that the driver was attempting to flee. After about one block, the Tempo pulled into the parking lot of a fast food restaurant. Officer Green followed it into the lot, parking his car about fifteen feet away and nearly perpendicular to it so that his car was facing the driver's side of the Tempo.

While Officer Green was still seated in his car, he saw the driver of the Tempo—later identified as appellant—begin to move around. As he got out of his police car and approached the Tempo, Officer Green continued to watch appellant. Green described appellant's movements as follows:

I could pretty much only see ... shoulder high. It appeared to me—his arms were down by his side. It appeared to me that his body kind of lifted up a little bit, and then, while looking at me, bent way down and kind of appeared to be either putting something underneath the seat, underneath the driver's seat, but definitely didn't take his eyes off me at all. Looked at me when I pulled my vehicle up, kind of raised his body up a little bit, and then bent all the way down. When he got all the way down, I could pretty much just see his head, and ... just one eye, maybe two, and then he sat back up.

Officer Green also noticed that appellant's eyes were "wide" and that he "looked kind of scared."

"Based on experience, the movement, [and] gestures," Officer Green believed appellant was pulling a gun from his waist and putting it under the seat. Green testified that he had been a police officer for five years and had worked in the Fourth District, where these events took place, for four of those years. He described the Georgia Avenue corridor as "high crime, violent crime, it's high narcotics, it's high everything—burglaries, robberies." He

also said that he had had previous experience with people engaging in similar movements after being pulled over, resulting in the discovery of weapons beneath their seats.

Officer Green approached the car with his hand on his gun, but he did not pull it out of its holster. When he reached the car, he told appellant to put his hands on the steering wheel and told the other passengers to put their hands up where he could see them. He then asked appellant for his license and registration. Appellant retrieved his registration from the glove compartment and handed it to the officer, along with his driver's license. Officer Green then asked appellant to step out of the car and signaled to his partner to pull the front seat passenger out of the car while the back seat passengers "kept their hands on the backs of the [front] seats." Officer Green then directed appellant to move to the rear of the car and said, "Look, I know you put something underneath the seat." When appellant denied that he had done so, Green responded, "I'm going to check," and appellant said, "Go ahead." [1] Officer Green then shined his flashlight under the seat and discovered a gun there, which he seized.

Appellant corroborated much of Officer Green's testimony, but he denied that he was putting a gun under the seat, stating instead that he had merely bent over to turn down the radio. He explained that he usually reclined his seat in his car, so that he had to sit up and lean forward to reach the radio dial. He admitted owning the gun, but he said he had put it under the seat two months earlier when he had purchased it and had not moved it since then.

The court ruled that appellant's movements, when viewed from the perspective of a reasonable and experienced police officer, were sufficient to support a reasonable suspicion that appellant had a gun. The court specifically relied on Officer Green's experience in reaching this conclusion. On the following day, the court made supplemental findings of fact, specifically crediting the testimony of Officer Green and finding that the movements by appellant were an "unambiguous effort to conceal."

## II

In any appeal challenging the denial of a motion to suppress evidence, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted). We review the trial court's findings of fact for clear error and its conclusions of law *de novo. United States v. White,* 689 A.2d 535, 537 (D.C. 1997). In the latter category are "ultimate questions," such as whether the police had reasonable grounds to stop a suspect and conduct a search. *See In re R.M.C.,* 719 A.2d 491, 494 (D.C.1998) (citation omitted).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established the test for determining when a police officer may permissibly stop someone and conduct "a reasonable search for weapons for the protection of the police officer" without a warrant and without probable cause. According to the Court, an officer may conduct such a search

> where he has reason to believe that he is dealing with an armed and dangerous

---

1. Appellant said he did not know whether he was giving permission to Officer Green to conduct a search, and Officer Green admitted that he did not phrase his statement as a question asking for permission to search. La-

ter, in ruling on the motion, the court said, "At this point I am not going to find that alternatively the defendant consented to the search . . . ."

individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. 1868 (citations omitted). An articulable suspicion is "substantially less than probable cause," but more than a mere "hunch" or "gut feeling." *See Brown v. United States,* 590 A.2d 1008, 1014 (D.C. 1991). Moreover, "[i]n judging the reasonableness of the actions of the arresting officer, the circumstances are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Peay,* 597 A.2d at 1322 (citation omitted). In the specific context of a lawful traffic stop, a police officer may search the passenger compartment of an automobile for weapons, even without probable cause, "if the police officer possesses a reasonable belief, based on specific and articulable facts ... that the suspect is dangerous and ... may gain immediate control of weapons"; the search, however, must be "limited to those areas in which a weapon may be placed or hidden ...." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (citing *Terry;* footnote and internal quotation marks omitted).

■ Appellant does not dispute that he was legitimately stopped for a traffic violation or that he could be asked to get out of the car after he was stopped, nor could he validly do so. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"). Rather, he argues that his bending motion did not create a reasonable suspicion that allowed Officer Green to search under the front seat. The government, on the other hand, asserts that appellant's movements, when considered together with his failure to stop immediately, the nature of the neighborhood as a high crime area, and Officer Green's experience, raised a reasonable suspicion in the officer's mind that appellant had a gun. We think the government has the better argument.

There are several cases that deal with the issue of a police officer's reasonable suspicion based on so-called "furtive" movements. The case most similar to the one at bar is *United States v. Green,* 151 U.S.App.D.C. 35, 465 F.2d 620 (1972). In that case, Green was stopped by the police for speeding and running a stop sign. "Prior to bringing appellant's vehicle to a halt, [the police officer] testified that when he saw appellant, 'his body was leaned over, and it appeared as though his arm was in front of his body, not to the side or the rear.'" *Id.* at 36, 465 F.2d at 621. Green's shoulder, elbow, and forearm were visible to the officer. The officer further testified that it did not appear that Green "was going for his wallet." *Id.* After the car was stopped, the officer "lean[ed] inside the car from the driver's side and recover[ed] a fully-loaded pistol from underneath the driver's seat." *Id.*

The court began its analysis by differentiating between two types of traffic stops: "pure" traffic stops and those involving "special circumstances." The latter category often includes a situation in which an

"officer notes a suspicious movement by one of the car's occupants as he makes his approach." *Id.* at 38, 465 F.2d at 623 (quoting *United States v. Robinson,* 145 U.S.App.D.C. 46, 62 n. 14, 447 F.2d 1215, 1231 n. 14 (1971) (en banc)). Noting that the traffic stop in *Green* might have begun as a "pure" or routine one, "it ceased to be such when the officers, observing the furtive movements by the occupant of the vehicle, became reasonably fearful of danger." 151 U.S.App.D.C. at 38, 465 F.2d at 623. Accordingly, the majority upheld the search as reasonable because the police "observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat." *Id.*[2]

Appellant argues that because *Green* was decided by the District of Columbia Circuit after February 1, 1971, it is not binding precedent. Technically, this is correct. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). However, in *United States v. Thomas,* 314 A.2d 464 (D.C.1974), this court was called upon to consider a search based in part on a similar furtive gesture. In reversing the trial court's ruling that the search was not reasonable, we said:

> Additionally, there are two decisions within this jurisdiction which lead to the same result. They are this court's opinion in *McGee v. United States* ... and the Circuit Court's opinion in *United States v. Green,* 151 U.S.App.D.C. 35, 465 F.2d 620 (1972). In both of these cases, police officers pursued routine traffic offenders, and observed gestures which led the officers to believe the subjects might be armed. In each case the

offender was stopped and directed out of his car, following which a limited search of the car revealed a gun. In neither case was the suspect formally placed under arrest prior to the fruitful search for the gun. Both searches were held to be reasonable.

*Thomas,* 314 A.2d at 469. Because we relied on *Green* to such a great extent in *Thomas,* it is fair to say that we adopted its holding as part of our case law. *See also Watts v. United States,* 297 A.2d 790, 793 (D.C.1972) ("We have no problem with either of those decisions," referring to *McGee* and *Green*).

It is therefore quite significant that the furtive movement made here by appellant was remarkably similar to that in *Green,* in which the officer "observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat." 151 U.S.App.D.C. at 38, 465 F.2d at 623. Here, in a similar fashion, appellant first sat upright, as if to take something from his waistband, and then leaned all the way forward, as if to place that object under his seat. The movement here is also virtually identical to that in *United States v. Edmonds,* 345 U.S.App. D.C. 131, 240 F.3d 55 (2001), in which a search was held to be reasonable based in part on a furtive gesture described by the police officer as follows: "I saw the defendant lean all the way forward ... almost ducking out of my sight. I could see his head above the dashboard, and then I saw him lean back up, seated upright in the vehicle." *Id.* at 137, 240 F.3d at 61. Although the defendant asserted, as an innocent explanation for his bending move-

---

**2.** Judge Wright dissented on the ground that "mere furtive movements alone establish nothing" and that there was no additional evidence to show that the defendant's movements were not innocent. 151 U.S.App.D.C. at 43, 465 F.2d at 628 (citations and internal quotation marks omitted). Judge Wright dis-

tinguished *McGee v. United States,* 270 A.2d 348 (D.C.1970) (discussed *infra*), on the ground that the driver's failure to stop the car in that case provided the crucial additional evidence of guilt. *Green,* 151 U.S.App.D.C. at 44 n. 6, 465 F.2d at 629 n. 6.

ment, that he was merely turning down the radio, "[t]he issue is whether the officer had articulable suspicion, not whether [the defendant's] actions could be construed as innocent behavior." *In re D.E.W.*, 612 A.2d 194, 197 (D.C.1992) (citation omitted).

It is also significant that at the time appellant made his furtive gesture, he was aware that the police were pursuing him. In *McGee v. United States*, 270 A.2d 348 (1970), the defendant failed to stop when a police officer attempted to pull him over for speeding. When the officer used his public address system to get the driver's attention, he "observed appellant reach down below the front seat of the automobile toward the floorboard and apparently place something under the seat." *Id.* at 349. McGee still did not stop, and the police officer had to stop him by blocking McGee's car with his own police car. After the stop, with McGee out of the car, the officer reached under the front seat and recovered a gun. We held that the search was reasonable, noting that "[t]he significance of appellant's movement is that it was made simultaneously with the realization that he was about to be halted by the police. The police officer, therefore, was reasonably justified in suspecting that appellant was attempting to conceal contraband or the instrumentality of a crime." *Id.* at 350; *see Thomas*, 314 A.2d at 468 ("It is to be expected that persons who are being pursued by police officers will seek to hide contraband such as an illegal weapon" (citation omitted)); *United States v. Johnson*, 341 U.S.App.D.C. 289, 292, 212 F.3d 1313, 1316 (2000) (furtive gestures are "significant only if they were undertaken in response to police presence"). This important factor articulated in *McGee* and *Thomas* is present here, for there is undisputed testimony in the record, credited by the trial court, that appellant looked frightened during the traffic stop and never took his eyes off Officer Green as he made the bending movement.

Another important factor in this case is Officer Green's past experience in dealing with similar furtive gestures. As the trial court noted, Officer Green had "at least one prior experience where he had occasion to participate in a stop [when he] observed similar movements," finding a gun on that occasion as well. Such experience weighs in favor of a finding of reasonableness. *Cf. Johnson v. United States*, 350 A.2d 738, 741 (D.C.1976) ("On previous occasions, such a situation had proved hazardous to the officer since guns had been found under similar circumstances of accessibility in the recent past"). Furthermore, the stop took place in a high crime area. Although this factor by itself cannot give rise to reasonable suspicion, it is certainly relevant. *See Smith v. United States*, 558 A.2d 312, 316 (D.C.1989) (en banc). That is especially true in this case, given that the area where appellant was stopped was not just a "high crime" area, but an area known specifically for the type of activity—*i.e.*, gun possession—of which Officer Green suspected appellant. *Cf. Edmonds*, 345 U.S.App.D.C. at 136, 240 F.3d at 60 ("the government established not just that [the area] suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infractions— drug and firearm offenses—that [the officer] suspected [the defendant] of committing").

Finally, there is the fact that appellant further aroused suspicion by failing to stop and pull over immediately when the officer turned on his emergency lights. Although attempting to flee from the police can contribute to reasonable suspicion, *see Cousart v. United States*, 618 A.2d 96, 99 (D.C.1992) (en banc), *cert. denied*, 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993), there is no evidence that appellant's

failure to stop immediately was an attempt to flee. Nevertheless, while appellant did slow down after he was signaled to stop and pulled over after only one block, he passed up several suitable places to stop, thus prompting Officer Green to activate his siren. When considered in context with the other factors already discussed, appellant's failure to pull over promptly contributed to the reasonableness of the fear felt by Officer Green. *Cf. United States v. Walraven,* 892 F.2d 972, 975 (10th Cir.1989) (upholding investigative detention, made for safety reasons, based in part on the defendant's "failure to promptly stop" the car that he was driving). We therefore hold, in light of the totality of the circumstances, that there was reasonable articulable suspicion to believe appellant was armed, and that Officer Green's search of the area under the driver's seat and his seizure of the gun did not violate appellant's Fourth Amendment rights.

Two cases decided since *Thomas* and *McGee* on which appellant relies do not persuade us to rule differently. In *Powell v. United States,* 649 A.2d 1082 (D.C.1994), we held that the furtive movement at issue did not support a reasonable suspicion. In that case, police officers stopped Powell after seeing him make an abrupt turn into an alley at 3:00 a.m. and then fail to stop at a stop sign. After signaling Powell to stop, but while still pursuing him, one of the officers saw Powell bend and duck toward the passenger seat. Upon stopping Powell's car, the officer asked him for his license and registration, asked him to get out of the car, and then began to pat him down. The patdown resulted in the recovery of a pistol from Powell's waistband.

The trial court held that the police had reasonable suspicion to frisk Powell. We reversed in a one-paragraph per curiam opinion, but there was no consensus as to why the seizure of the gun was unlawful.

The two judges in the majority wrote separate opinions, while the third judge dissented from the reversal; hence there was no opinion for the court. Judge Sullivan reasoned that there was no evidence that the bending and ducking also included a reaching, and that the case therefore could not be properly labeled as a "furtive movement" case. *Id.* at 1085–1086. Judge Farrell, on the other hand, wrote separately to express his opinion that "without more, appellant's earlier bending movement (even calling it a reaching) was too weak an indication that he had armed himself to permit the additional intrusion of a frisk." *Id.* at 1091. This view was based on the fact that "[b]y the time he was ordered out of the car, the police had let him search through the glove compartment for his registration, and his hands were visible to them as he surrendered the documents and exited the car." *Id.* (footnote omitted).

Not only is *Powell* of minimal precedential value because of its failure to command a majority opinion, but appellant's argument would fail under the analysis of either of the judges who voted to reverse. Judge Sullivan's opinion was based on his belief that the movement at issue was not properly characterized as "furtive" because it involved no reaching. Here, however, the evidence showed—and the court found—that appellant made a reaching movement underneath the driver's seat. With respect to Judge Farrell's opinion, he stated in a key footnote that the movement in *Green* was adequate to permit a search. *See id.* at 1091 n. 3. Because the movement here was virtually identical to that in *Green,* we are satisfied that Judge Farrell's reasoning in *Powell* would support a conclusion that appellant's movement, considered in combination with the other factors present, was a sufficient basis for conducting a protective search. We are reinforced in this view by the trial court's

decision to credit the testimony of Officer Green and its finding that appellant's movement was an "unambiguous" effort to conceal something beneath his seat. This finding distinguishes the case from *Powell*, in which Judge Farrell found the movement "too weak an indication" to give rise to a reasonable suspicion. *Id.* at 1091.[3]

Appellant relies in addition on *United States v. Page*, 298 A.2d 233 (D.C.1972), which is distinguishable from the case at bar in one important respect. In *Page* two police officers stopped a car for speeding on a busy street during rush hour. At the time of the stop, one of the officers noticed the passenger in the right rear seat move "his right arm and shoulder 'as if to hide something' or 'put something away, get something.'" *Id.* at 234. The officer asked the passenger to get out of the car and conducted a patdown, which resulted in the recovery of a pistol and a quantity of white powder. We held this search to be unreasonable, stating:

> The fact that the furtive movements were not made by a suspect but by a passenger in the rear seat of a car stopped for speeding is of considerable significance in examining the reasonableness of the officer's actions, for furtive movements standing alone would hardly warrant the search of the individual concerned.... This is necessarily true where the only reason for the stop and investigation is a simple traffic offense without any indication of criminal activity either on the part of the driver or passengers.

*Id.* at 237 (citations omitted). Unlike appellant in the instant case, Page (the passenger) was not the individual whose activities had caught the officer's attention and led the police to stop the car. Thus the important factor stated in *McGee*—that

the person suspected of wrongdoing is the one making the furtive gesture—was not present in *Page*, but it certainly is here.

For the foregoing reasons, appellant's conviction is

*Affirmed.*

---

**3.** In addition to reasonable suspicion, *Terry v. Ohio* also requires that the scope of the search be reasonable. *Terry*, 392 U.S. at 29, 88 S.Ct. 1868. In this case the trial court found that the scope was reasonable, and appellant does not challenge that ruling.