*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 12-CF-803

DONALD BROWN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-23028-11)

(Hon. Florence Y. Pan, Trial Judge)

(Submitted June 13, 2014                    Decided August 7, 2014)

*Cynthia Nordone* filed a brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, *Brandon Long*, and *James M. Perez*, Assistant United States Attorneys, filed a brief for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*:  Following a bench trial, the trial court found appellant, Donald Brown, guilty of carrying a pistol without a license ("CPWL"), possession of an unregistered firearm ("UF"), and unlawful possession of ammunition ("UA").  On appeal, appellant argues that the trial court erroneously denied his

motion to suppress because the police violated the Fourth Amendment when they: (1) stopped, seized, and attempted to frisk him without reasonable articulable suspicion; and (2) conducted a warrantless frisk and search of his jacket after they removed it from his person when he attempted to flee. Assuming that the police action in this case actually amounted to a seizure of appellant, we affirm appellant's convictions and hold: (1) that officers had reasonable articulable suspicion to do so; and (2) that appellant abandoned his jacket, thereby placing the subsequent police inspection outside the scope of the Fourth Amendment.

## I.

On November 30, 2011, Officers Allen and Fisher responded to reports of a "man with a gun wearing a black hood, black hoody, blue jeans, brown complexion, and in the hallway gambling with several other[s]" in the building at 2446 Wagner Street in Southeast D.C. After Officer Allen canvassed the building in question and found no evidence of gambling, he and Officer Fisher spotted three men outside. Out of the three, two matched portions of the description given by dispatch: one "had a black hoody on with blue jeans" and another—appellant— "had on a black jacket with blue jeans" and a black hat. The individual with the hoody separated from the other two while they walked into a parking lot. Officers Allen and Fisher approached appellant and a second individual and, after

asking if they would be willing to speak, the officers explained that they were investigating a 911 call. Officer Allen asked both men if they had any weapons on them, to which both men responded in the negative. Officer Allen indicated that he "may" have to pat them down and, at this point, the second individual, continuing at his "normal pace," walked up to a fence and assumed the frisk position on his own. Appellant slowed down and began to follow suit but, after putting his hands up, put them down and repeated those actions a second time "like he was a little indecisive of exactly what he wanted to do." Officer Allen, noting appellant's indecisiveness, suggested that he set down the fast-food bag and beverage he was holding. Appellant started to do so, but then fled. As he began running, Officer Allen reached out and grabbed the back of appellant's jacket, which appellant "wiggled out of." Dropping the jacket, Officer Allen continued to pursue appellant until he was apprehended a short time later with the help of two other officers. During this time, Officer Fisher remained and frisked the other individual[1] and picked up appellant's jacket. As she frisked him with one hand, Officer Fisher held appellant's jacket in the other hand. She immediately noticed that appellant's jacket felt heavy. She then frisked the jacket, felt something hard inside of it, and knew it was a gun. Officer Fisher took out a gun from the inside

---

[1] Nothing was found during the frisk and the second individual was not further detained.

right pocket. It was later identified as a loaded .22 caliber semi-automatic. She also found a cellphone with appellant's picture on the front, a SmarTrip card, and McDonald's gift certificates in the jacket.

A grand jury indicted appellant on December 21, 2011, on one count of CPWL, in violation of D.C. Code § 22-4504 (a) (2011 Supp.), one count of UF, in violation of D.C. Code § 7-2502.01 (2011 Supp.), and one count of UA, in violation of D.C. Code § 7-2506.01 (2011 Supp.). On March 2, 2012, appellant sought to suppress physical evidence—namely, the weapon and ammunition found in his jacket—on the grounds that the evidence was obtained following an illegal stop, seizure, and search in violation of the Fourth Amendment. The trial court denied the motion, finding that: (1) the officers responded to a radio run in a high crime area; (2) appellant and his acquaintance were initially involved in a consensual encounter with police;[2] (3) appellant was not seized until Officer Allen

---

[2] The trial court made the following findings:

> The officers were speaking to the defendant and his companion. They used a conversational tone. Weapons were holstered. They asked if they could speak to the defendant and his companion. They said they were investigating a 911 call and they said—they asked if the defendant and his companion had anything illegal. And then they said I may have to pat you down.

(continued . . .)

grabbed his jacket; (4) at the time of seizure, the officers had a reasonable articulable suspicion; and (5) appellant abandoned his jacket when he wiggled out of it and ran away, thereby eliminating any reasonable expectation of privacy he may have had in it.  Appellant was found guilty on all counts and sentenced to twelve months incarceration for CPWL, six months for UF, and six months for UA, with all sentences running concurrently.  On appeal, appellant argues that the trial court erroneously denied his motion to suppress the gun recovered from his jacket, and therefore his convictions based on possession of the gun and its ammunition should be vacated.

## II.

"When reviewing the denial of a motion to suppress, we defer to the trial court's findings of fact, but we determine questions of law *de novo*." *Tuckson v.*

---

(. . . continued)

> I don't think any of these statements to the defendant or his companion constituted an order or indicated that the defendant or his companion were not free to leave.  They didn't order the defendant to submit to a patdown.  They didn't order the defendant to put down his food and drink.  They were having a conversation with him.  I think he went to the fence because his companion had done so and so he was just following suit.  It was not because the officers told him to go to the fence or told him that he was going to be frisked.

*United States*, 77 A.3d 357, 360 (D.C. 2013) (internal quotation marks omitted) (quoting *Napper v. United States*, 22 A.3d 758, 766 (D.C. 2011)). We recognize that, consistent with the Fourth Amendment, officers "must have a reasonable, articulable suspicion that criminal activity may be afoot" in order to conduct a "brief, investigatory stop." *Singleton v. United States*, 998 A.2d 295, 299 (D.C. 2010) (internal quotation marks omitted) (quoting *Wilson v. United States*, 802 A.2d 367, 369 (D.C. 2002)). "[T]he threshold question is whether a seizure has occurred" because "an encounter will not trigger Fourth Amendment protection unless it ceases to be consensual." *Jackson v. United States*, 805 A.2d 979, 984 (D.C. 2002); *see also In re J.F.*, 19 A.3d 304, 309 (D.C. 2011) ("It is '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that] we may conclude that a 'seizure' has occurred.'" (alterations in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968))). To raise a Fourth Amendment challenge to a search or seizure, a person must have a reasonable expectation of privacy in the person or property seized or searched. *Napper*, 22 A.3d at 767. Whether there has been a seizure, whether officers have a reasonable articulable suspicion, and whether a person has standing based on a reasonably expectation of privacy are issues of law we review *de novo*. *See Henson v. United States*, 55 A.3d 859, 863 (D.C. 2012) (seizure); *Singleton*, 998 A.2d at 299 (reasonable articulable suspicion); *Napper*, 22 A.3d at 769

(expectation of privacy).

### III.

The trial court found that appellant was seized when Officer Allen grabbed appellant's jacket.[3]  The relevant question, therefore, is whether the officers had a reasonable articulable suspicion that criminal activity was afoot at that point in time.  *See Terry*, 392 U.S. at 30.  Given the facts of this case, we agree with the trial court that the officers had reasonable articulable suspicion to stop appellant at the time they grabbed his jacket.  *See, e.g.*, *Jackson*, 805 A.2d at 989 ("Various factors are considered in determining whether a *Terry* stop is justified, including 'the time of day, *flight*, *the high crime nature of the location*, furtive hand movements, an informant's tip, *a person's reaction to questioning*, *a report of criminal activity* or gunshots, and viewing of an object or bulge indicating a weapon.'" (emphasis added)); *see also Trice v. United States*, 849 A.2d 1002, 1006

---

[3]  The government notes that the trial court's finding on this point may be incorrect, based on our subsequent decision in *Henson v. United States*, 55 A.3d 859 (D.C. 2012).  In *Henson*, we held that a person was not seized within the meaning of the Fourth Amendment when officers grabbed his arm, and later his jacket, because his freedom of movement was not terminated and the officers "did not acquire 'physical control'" over the person when he broke free from their grasp, wiggled out of his jacket, and continued running.  *Id.* at 866-67.  Here, we assume that appellant was seized when Officer Allen grabbed his jacket, but we need not decide the issue because by that time the officers had acquired reasonable articulable suspicion.

(D.C. 2004) ("Despite the general rule, immediate safety concerns may justify police in stopping, or stopping and frisking, a person based on his association with someone else whom the police reasonably suspect of criminal activity."); *Bennett v. United States*, 26 A.3d 745, 756 (D.C. 2011) (noting that *Trice* recognized "two narrow exceptions" to the rejection of "guilt by association" as justification for seizure: (1) "immediate safety concerns" because the individual who matched the description was suspected of being armed and dangerous; and (2) due to recency of the crime, it would be reasonable to think the companion was aware of it and either a witness or an accomplice). Here the trial court noted that the seizure occurred in a high-crime area, the officers were "there to investigate a man with a gun," appellant "had been with the suspect who matched the lookout for the man with a gun to a 'T,'" appellant "made some hesitant or indecisive motions" that "could be interpreted as nervous and evasive behavior," and appellant "tried to flee after the police or just before the police were about to pat him down." All of these factors, taken together, gave the officers reasonable articulable suspicion to seize appellant.

We also agree with the trial court's determination that appellant abandoned his jacket and thus had no "legitimate expectation of privacy" in it. *Spriggs v. United States*, 618 A.2d 701, 703 & n.3 (D.C. 1992). "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced

by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question." *United States v. Boswell*, 347 A.2d 270, 274 (D.C. 1975). The trial court found that appellant intended to abandon his jacket (and the contents therein) when he wiggled out of it, ran away, and left it behind with "no indication that he was going to come back to get it because he was trying to make his escape." This finding was not clearly erroneous.[4] Because the officer had acted lawfully when he seized appellant, his abandonment of the jacket relinquished any reasonable expectation of privacy protected by the Fourth Amendment.[5] This determination forecloses appellant's motion to suppress. We

_____

[4] *See generally State v. Dailey*, No. 8-10-01, 2010 WL 3836204 at *4 (Ohio Ct. App. Oct. 4, 2010) ("[Appellant] claims that he did not voluntarily abandon his cell phone [and jacket] because his relinquishment of his coat was the result of the restraints placed upon him by [a store employee]. We disagree and fail to see how being restrained by [the employee] rendered his decision to leave his jacket and its contents behind involuntary. In fact, it seems rather clear that in an attempt to escape being detained by the store employee, [appellant] deliberately chose to leave his jacket and its contents behind. As a result, we find that he no longer retained a reasonable expectation of privacy . . . ."); *State v. Collins*, 874 So. 2d 724, 725-26 (Fla. Dist. Ct. App. 2004) ("Additionally, the State argues that by continuing to run after his jacket [was pulled] off [by police], [appellant] abandoned the jacket. . . . We conclude that because [appellant] abandoned the jacket, the search was legal. . . . Here it can be inferred by [appellant's] action of leaving his jacket behind in an attempt to flee from police that he did not intend to return to retrieve it.").

[5] The same actions would not constitute abandonment for Fourth Amendment purposes, however, if they were the result of an unlawful seizure or

(continued . . .)

have long held that "one who abandons property . . . lack[s] standing" to "raise the Fourth Amendment issue." *Boswell*, 347 A.2d at 273.

## IV.

Because the officers acted with lawful justification in their interactions with appellant, who abandoned any reasonable expectation of privacy in his jacket, the trial court properly denied appellant's motion to suppress. Appellant's convictions are hereby

*Affirmed.*

---

(. . . continued)
other police misconduct. *See, e.g.*, *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002) ("In order to be effective, abandonment must be voluntary. It is considered involuntary if it results from a violation of the Fourth Amendment. . . . [P]roperty is considered to have been involuntarily abandoned if the defendant discards it as a consequence of illegal police conduct." (citations omitted)); *United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973) ("The Government's standing argument does not, however, eliminate the necessity to determine the legality of the arrest, for a loss of standing to challenge a search cannot be brought about by unlawful police conduct.").